



**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

**THE DATE OF ENTRY IS ON**
**THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed September 30, 2019**

*Mark X. Mullin*

**United States Bankruptcy Judge**

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO. 16-43206-MXM-7 |
| LISA DAWN MCCOOL, | § | |
| | § | CHAPTER 7 |
| DEBTOR. | § | |
| | | |
| LYNN BESHEARS, | § | |
| | § | |
| | § | |
| | § | |
| PLAINTIFF, | § | |
| | § | |
| V. | § | ADVERSARY NO. 16-4153 |
| | § | |
| LISA DAWN MCCOOL, | § | |
| | § | |
| DEFENDANT. | § | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**
**DETERMINING DEBT OWED TO PLAINTIFF LYNN BESHEARS**
**TO BE NONDISCHARAGEABLE PURSUANT TO 11 U.S.C. § 523(a)(2)(A)**

The Court has conducted the trial on the Compliant[1] filed by Plaintiff Lynn Beshears ("***Beshears***") against Defendant Lisa Dawn McCool ("***McCool***"). By her Complaint, Beshears seeks a determination that McCool's debt to Beshears of $421,039.97, plus interest and attorney's fees, is nondischargeable under 11 U.S.C. § 523(a)(2)(A) or § 523(a)(6).

In addition to denying the factual basis for Beshears's causes of action, McCool raises the following affirmative defenses: (i) waiver; (ii) novation; (iii) each allegation of fraud or misrepresentation fails insofar as it relies on parole evidence not incorporated into the controlling agreement; (iv) each allegation of fraud or misrepresentation fails insofar as each allegation is based on statements relating to future contractual promises and not on statements relating to a past or existing fact; (v) estoppel; and (vi) limitations.

The Court has reviewed and considered the pleadings and briefing filed in this adversary proceeding, the testimony of witnesses, the exhibits admitted into evidence, and the arguments of counsel. The following constitutes the Court's findings of fact and conclusions of law[2] in support of this ruling as required by Federal Rule of Civil Procedure 52, made applicable in this adversary by Federal Rule of Bankruptcy Procedure 7052.

As set forth below, the Court finds and concludes that Beshears shall be granted a nondischargeable claim under § 523(a)(2)(A) of the Bankruptcy Code against McCool of $421,030.97, along with 9% per-annum post judgment interest from April 3, 2013 until paid and attorney's fees of $42,103.10, along with 5% per-annum post judgment interest from April 3, 2013 until paid. All other requested relief is denied.

---

[1] *Plaintiff's Third Amended Complaint Objecting to Dischargeability of Debt Under 11 U.S.C. §§ 523(a)(2)(A) and 523 (a)(6)* [Adv. ECF No. 92] (the "***Complaint***").

[2] Any findings of fact that should more appropriately be characterized as a conclusion of law should be regarded as such, and *vice versa*.

## I.     JURISDICTION AND VENUE

The Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(b) and 157(a) and the standing order of reference in this district.  This proceeding is a core proceeding over which the Court has both statutory and constitutional authority to enter a final judgment.  To the extent this proceeding is a non-core proceeding, the parties have consented to this Court's entry of a final judgment.[3]

Venue is proper pursuant to 28 U.S.C. § 1409(a).

## II.     BACKGROUND FACTS

### A.     Friendship between Beshears and McCool

In 2005, McCool purchased the Diamond W Equine Arena (the "***Diamond W***").[4] McCool's acquisition loan was secured by the Diamond W.  Beshears first met McCool in January 2006, when Beshears took a horse to the Diamond W to ride.[5]  Their friendship did not begin to develop, however, until a year or so later, shortly after Beshears's son had passed away in April 2007.[6]  McCool approached Beshears to express her condolences to Beshears for the loss of her son.[7]  And from that meeting, their friendship developed.[8]

In late summer or early fall 2007, McCool told Beshears that she needed to refinance the acquisition loan that was secured by the Diamond W or she would lose the arena.  McCool met several times with Beshears and her husband, Tex, about potential lending sources that might be

---

[3] *See Wellness Int'l Network, Ltd. V. Sharif*, 135 S. Ct. 1932, 1948-49 (2015).

[4] Trial Tr. at 99.  All references to the trial transcript are to the March 18, 2019 trial transcript found at Adv. ECF No. 116.

[5] *Id.* at 112.

[6] *Id.*

[7] *Id.*

[8] *Id.* at 112-113.

interested in providing a loan to refinance the debt on the Diamond W.[9] When McCool was not successful obtaining financing from two or three banks, she asked Tex if he would be willing to guarantee a bank loan on her behalf.[10] Tex ultimately declined McCool's request.[11] Thereafter, McCool then "just kind of disappear[ed]"[12] for several months in late 2007 and early 2008 because she was busy running the Diamond W and trying to arrange a refinancing loan for the Diamond W.[13]

###    B.    The April 2008 Loan

On April 24, 2008, McCool called Beshears in a "screaming panicked phone call."[14] McCool was trying to close a refinance of the loan secured by the Diamond W with a $4.5 million loan from Park Cities Bank, but a problem came up at closing and McCool needed an additional $420,000 to satisfy the existing debt.[15] McCool had sought the additional $420,000 loan from Frost Bank, but the bank decided not to make the loan to McCool.[16] McCool was "crying and screaming"[17] on the phone saying, "I'm going to lose it, I'm going to lose it . . . I'm going to lose all of it, I'm going to lose all of it."[18]

---

[9] *Id.* at 114.

[10] *Id.* at 114-15.

[11] *Id.* at 114-15, 154.

[12] *Id.* at 116.

[13] *Id.*

[14] *Id.*

[15] *Id.* at 116-18.

[16] *Id.* at 118.

[17] *Id.* at 116.

[18] *Id.* at 117.

Because it was a couple days from the one-year anniversary of the death of her son, Beshears was already in an emotional state, but she became even more upset by McCool's emotional and frantic demeanor during the telephone call.[19]  Beshears told McCool that she would ask Tex if he would be willing to loan the $420,000 to McCool.[20]  But when Beshears asked Tex if he would make the loan to McCool, "he was upset that I would ask him that,"[21] and he said, "absolutely not, I won't loan her any money."[22]

After Beshears broke the news to McCool that Tex was not willing to make the loan, McCool then, and in several subsequent telephone calls that day, continued to ask Beshears if there was any way that she could loan her the funds.[23]  During these same series of telephone calls, McCool made specific representations to Beshears about land in Kansas and Fort Worth as well as McCool's interest in oil and gas royalties that, according to Beshears, ultimately induced her to make the loan urgently requested by McCool.  It is these alleged representations that are at the heart of the § 523(a)(2)(A) claim.

According to Beshears, McCool represented that "I own" [24] property in Kansas and that "Lynn, this Kansas property is in the closing process right now, I can have you paid within thirty days, I – I can't imagine it would take longer than that but, at the most, ninety days I'll have your money to you."[25]  In addition, Beshears alleges that McCool represented that she owned oil and

---

[19] *Id.* at 116-17.

[20] *Id.*

[21] *Id.* at 120.

[22] *Id.* at 117.

[23] *Id.* at 118-21.

[24] *Id.* at 118.

[25] *Id.* at 120-21, 132.

gas royalties. And when Beshears asked "will you promise me that I will be the very first person you pay back, whether it's royalty or land you sell, will you give me your word that I will be the first one back – that you pay back?"[26] McCool replied, "Lynn, I promise, I promise you'll be the very first."[27] McCool admitted in her testimony that she "probably talked" about the Kansas land, Fort Worth land, and her oil and gas royalties "at the time the loan was made."[28]

Although Beshears was "nervous"[29] about making the loan, she believed McCool, and based on McCool's oral statements, representations, and promises, Beshears—after finally convincing Tex to lend Beshears the money[30]—agreed to make the loan to McCool. And on April 26, 2008, Beshears wired $420,599 to McCool without any formal written agreements.

Beshears testified persuasively and credibly that she would not have made the loan without McCool's oral statements, representations, and promises (i) about the land (which was allegedly in the sale closing process) and royalties, and (ii) that Beshears would be the "very first" person

---

[26] *Id.* at 121.

[27] *Id.*

[28] *Id.* at 230, 232. McCool's counsel specifically asked McCool – "Q. Okay. But you agree that you probably talked about all those things [the land in Kansas and Fort Worth and the royalties] with Ms. Beshears at the time the loan was made? A. yes." *Id.* at 232.

[29] *Id.* at 120.

[30] *Id.* at 119. McCool made the point at trial that Beshears credibility is in question because at the time of the loan and in her pleadings, Beshears represented that she informed McCool that she was risking her retirement funds by making the loan to McCool. McCool argues that Beshears is attempting to deceive the Court with this allegation because Beshears did not actually take money from her 401(k)-retirement account to make the loan to McCool. Beshears testified what she meant by this statement was that she had saved the money in her retirement account for 28 years and was prepared, if necessary, to repay Tex using those funds if McCool failed to repay Beshears. That is one way Beshears was risking her retirement funds. Even though Beshears did not give Tex a security interest in her retirement account, Beshears effectively repaid her loan to Tex when Tex twice (in January 2009 and January 2010) withheld his annual $200,000 spousal gift to Beshears. *See* Trial Tr. At 123. In the past, Tex made annual $200,000 spousal gifts to Beshears so that she could use those funds in retirement. Tex's withholding of $400,000 of spousal gifts in the aggregate has affected the amount of money Beshears has for retirement. *Id.* Although this issue is not material for the Court's ruling on the § 523(a) claims, the Court is satisfied that Beshears's clarified testimony was credible and that she did not intend to deceive the Court.

McCool would pay back from the first proceeds that McCool received from either the oil and gas royalties or sale of land, whichever occurred first. Beshears specifically testified that she would not have made the loan if McCool's plan to repay Beshears was based on the success of the Diamond W business as opposed McCool's agreement to repay the loan from the first proceeds received from the oil and gas royalties or land sale proceeds.[31]

On April 28, 2008—just two days after the April 26, 2008 loan—McCool signed the refinancing loan documents with Park Cities Bank that included an assignment to the Bank of the very royalties that McCool had promised to use "first" to repay Beshears.[32]

### C.    The June 2008 promissory note

In early June 2008, McCool called and told Beshears her that she had something to give her and was coming to Beshears's house.[33] Rather than coming with money to repay the loan, as Beshears had anticipated, McCool arrived with a promissory note for $420,599 (the "***Note***") and two checks of $5,000 each, one dated May and one dated June, for interest payments on the Note.[34]

Several days after the loan was made, McCool prepared the Note with the help of her attorney at the Rattikin & Rattikin, L.L.P. law firm.[35] The Note included a 9% annual interest rate and a provision that the Note "shall be fully due and payable upon the sale of the Maker's 11.84 acre tract of land located in Fort Worth, Texas or the sale of the Maker's 160 acre tract of land located in Kansas, whichever occurs first."[36] The Kansas land described in the Note was the same

---

[31] Trial Tr. at 135-36.

[32] Deed of Trust ¶ 8, Def.'s Ex. 7(B); Assignment of Mineral Production at 1-2, Def.'s Ex. 7(D).

[33] Trial Tr. at 127.

[34] *Id.*

[35] Pl.'s Exs. 1 and 4.

[36] Pl.'s Ex. 1.

Kansas land that McCool said she owned and was in the sale-closing process when trying to secure the loan from Beshears on April 24, 2008. The 11.84 acre tract of land described in the Note was real property in Fort Worth upon which a flea market was operated, and (according to McCool) was worth more than enough to repay Beshears in full.[37] Although the Note has a heading that says, "UNSECURED NOTE," the Note also refers to Beshears's ability to foreclose in accordance with a "Deed of Trust given to secure payment hereof."[38] The parties agree that they never actually signed and recorded a deed of trust.

During the meeting when McCool presented the Note to Beshears, McCool reiterated her promise that "[T]he first one that I get the money from, I'll pay you."[39] Despite McCool's promise, Beshears was disappointed that McCool presented her with the Note rather than being repaid in full, but she felt "forced" to accept the Note because if she took legal action, McCool's bank might foreclose, preventing Beshears from getting repaid.[40]

McCool continued to make monthly interest payments to Beshears from May 2008 to March 2009.[41]

### D. The March 2010 Hospital Meeting

In March 2010, McCool called Beshears and requested that she meet McCool in Fort Worth at a nearby hospital[42] because McCool "has something" for Beshears and that she "had a contract

---

[37] Trial Tr. at 132.

[38] Pl.'s Ex. 1.

[39] Tr. at 130.

[40] *Id.* at 136-37.

[41] Trial Tr. at 173.

[42] McCool was at the hospital visiting a family member. Trial Tr. at 240.

on the Fort Worth property."[43]   Beshears, once again, was expecting that McCool was going to repay her loan in full from the sale proceeds of the Fort Worth land.   When they met, however, McCool presented Beshears with a $100,000 check.[44]   According to McCool, the sale of the Fort Worth land had not closed due to environmental and excavation issues that were not yet resolved, but the buyer [curiously][45] agreed to release $100,000 from escrow while McCool continued the environmental remediation on the land.[46]

In response to McCool's story about environmental and excavation issues on the Fort Worth land, Beshears asked about the status of the sale of the Kansas land.[47]   It was then—for the first time—McCool admitted that her stepfather actually owned the Kansas land and that he would not sell it.[48]   Beshears was stunned at this latest revelation (that McCool did not actually own the Kansas land) and she demanded McCool to repay the loan because "this had gone on so long."[49] In response, McCool represented to Beshears that the alleged environmental and excavation issues with the Fort Worth land should be completed in just a few months and that the Fort Worth land would close within a year,[50] at which time Beshears's loan would be paid in full.

---

[43] Trial Tr. at 137.

[44] *Id.* at 138.

[45] The Court believes that the March 4, 2010 sale of the Fort Worth property had, in fact, closed before the hospital meeting and that McCool's statements about the sale not having closed were not true.

[46] Trial Tr. at 138.

[47] *Id.* at 139.

[48] *Id.*

[49] *Id.*

[50] *Id.* at 139-40.

### E. McCool uses the oil and gas royalty payments and proceeds from the sale of the Kansas and Fort Worth properties for her business and other personal expenses as opposed to "first" paying Beshears

After receiving the $100,000 loan payment in March 2010, Beshears did not receive any other loan payments from McCool. Further, Beshears did not learn of most of the following facts until years later:

- The sale of the Fort Worth land had closed on March 4, 2010 for $2,850,000 – prior to the 2010 March meeting at the hospital.[51] McCool did not actually own the Fort Worth property, as she previously told Beshears. The actual owner was Las Pulgas Bailando, Ltd. McCool and Normandy, Inc. were the limited partners of Las Pulgas Bailando, Ltd., and LPB Investments, LLC was the general partner.[52]

  - Las Pulgas Bailando, Ltd., after paying off the mortgage on the property and paying other closing costs, netted $2,023,124.37.[53]

  - On or about March 8, 2010, the title company wired $1,011,562.18 (half of the net sales proceeds) to McCool's bank account at Frost Bank.[54]

- The sale of the Kansas Property closed on or about December 17, 2010 for $471,150, with McCool receiving $235,625.[55]

  - The seller of the Kansas property was McCool and her brother Lee Choate. It is not clear in the record how the right to sell the property transferred from

---

[51] Pl.'s Ex. 19.

[52] Pl.'s Ex. 18.

[53] Pl.'s Ex. 19.

[54] Pl.'s Ex. 20.

[55] Pl.'s Ex. 21-23; Pl.'s Ex. 12 at Beshears_00116.

McCool's stepfather to McCool and her brother, but it is clear that McCool was not the owner and did not have the power to sell the Kansas property when McCool told Beshears in April 2008 that the Kansas property "is in the closing process right now."[56] Further, McCool did not use any of the proceeds she ultimately received from the sale of the Kansas property to pay Beshears.

- In her 2008 individual tax return, McCool reported "Royalties received" of $1,033,593.[57]

- In her 2009 individual tax return, McCool reported "Royalties received" of $661,040.[58]

- In her 20010 individual tax return, McCool reported "Royalties received" of $427,469.[59]

- McCool used proceeds she received from the Kansas property, Fort Worth property, and the oil and gas royalties to pay Park Cities Bank, to support the Diamond W, to pay other creditors, and to pay for McCool's personal spending.[60]

### F. Beshears sues McCool in state court, obtains a judgment, and begins collection efforts

In 2012, Beshears filed suit against McCool in the 22nd District Court of Hamilton County, Texas and obtained a "Final Summary Judgment" against McCool (the "***Underlying Judgment***")

---

[56] Trial Tr. at 120.

[57] Pl.'s Ex. 6 at Beshears_00028.

[58] Pl.'s Ex. 7 at Beshears_00045.

[59] Pl.'s Ex. 12 at Beshears_00118.

[60] Trial Tr. 56, 72, 248, 266.

for $418,340.81, plus attorney's fees of $41,834.08 (10% of the amount of the principal and interest owed on the Note) and 9% per-annum post-judgment interest.[61] Beshears filed an Abstract of Judgment in Hamilton County, Texas on April 12, 2013.[62] Beshears began collection efforts, including obtaining two writs of execution,[63] but her collection efforts were stayed by McCool's two bankruptcy filings.

### G.    McCool's bankruptcy filings

On October 22, 2013, McCool filed her first voluntary petition for relief under Chapter 13 of the Bankruptcy Code (the "***First Bankruptcy***"),[64] staying the collection of the Underlying Judgment pursuant to 11 U.S.C. § 362. The case was later converted to a Chapter 11. Park Cities Bank filed a motion to dismiss the First Bankruptcy case, which was granted pursuant to the Bankruptcy Court's *Order Dismissing Case With Prejudice*[65] entered on June 20, 2014.

On August 24, 2016, McCool filed the underlying case under Chapter 7 of the Bankruptcy Code.[66] The Chapter 7 trustee certified the case as a "no asset" case, meaning the trustee had determined there will be no distributions to unsecured creditors.[67] December 19, 2016 was the deadline for parties to object to McCool's discharge or to challenge whether certain debts owed by McCool are dischargeable.[68] McCool received her discharge, which generally discharged

---

[61] Pl.'s Ex. 2.

[62] Pl.'s Ex. 40.

[63] Pl.'s Exs. 41-42.

[64] 13-35384-sgj13, Bankr. ECF No. 1. The case was subsequently dismissed with prejudice.

[65] In re McCool, Case No. 13-35384-sgj-11 [ECF No. 153].

[66] Bankr. ECF No. 1.

[67] 1/9/2017 docket entry, Case No. 16-43206.

[68] *Notice of Chapter 7 Bankruptcy Case −− No Proof of Claim Deadline*, ECF No. 4, Case No. 16-43206.

McCool's debts except for any nondischargeable debts, including any debts found nondischargeable in this Adversary Proceeding.[69]

### H.      Beshears files § 523 complaint and amended complaints

On December 19, 2016, Beshears timely filed her original § 523 complaint (the "***Original § 523 Complaint***").[70]  In the Original § 523 complaint, Beshears alleged (among other things) that "Ms. McCool manipulated Ms. Beshears into lending her money (as described more fully below),"[71] and the complaint also referred to the April 2008 loan.[72]  The Original § 523 Complaint was scant on details on how that manipulation occurred.  The Original § 523 Complaint asserted a cause of action under § 523(a)(2)(A) based on alleged prepetition fraudulent transfers by McCool, including her transfer of horses and equine equipment.[73]

McCool filed a motion to dismiss the Original § 523 Complaint (the "***First Motion to Dismiss***"),[74] arguing that alleged fraudulent transfers made five years after the April 2008 loan are not actions to obtain money by false pretenses, a false representation, or actual fraud under § 523(a)(2)(A).  The Court granted the First Motion to Dismiss without prejudice to Beshears's filing an amended complaint.[75]

---

[69] *Order of Discharge*, ECF No. 31, Case No. 16-43206.

[70] *Plaintiff's Original Complaint Objecting to Dischargeability of Debt Under 11 U.S.C. § 523(a)(2)(A)*, Adv. ECF No. 1.

[71] *Id.* ¶ 4.  As explained below, this allegation about McCool manipulating Beshears into lending money is in all of the complaints filed by Beshears and defeats McCool's argument that some of Beshear's claims are barred by limitations.

[72] *Id.* ¶ 5.  The Original § 523 Complaint also refers to the later written Note.

[73] *Id.* at 14-27.

[74] *Motion to Dismiss*, Adv. ECF. No. 4.

[75] *Order Granting Motion to Dismiss*, Adv. ECF No. 11.

On April 6, 2017, Beshears filed her amended § 523 complaint (the "***First Amended § 523 Complaint,***"[76] again alleging (among other things) that "Ms. McCool manipulated Lynn [Beshears] into lending her money (as described more fully below)."[77]  The First Amended § 523 Complaint alleges in relevant part that in April 2008, (a) McCool told Bashears that McCool had property in Fort Worth and Kansas, with the sale of either allowing for prompt repayment; and (b) McCool told Beshears that McCool would be able to sell one of these properties within 30-90 days.[78]  According to the First Amended § 523 Complaint, "[t]o that end," McCool signed the Note.[79]  The First Amended § 523 Complaint alleged that Beshears received royalty payments in 2008-2010, but did not allege that the April 2008 loan was based on McCool's promise to repay the loan from royalty payments.[80]  In addition, the First Amended § 523 Complaint asserted a cause of action under § 523(a)(6) based on (a) McCool's lies to a constable during Beshears's collection efforts, (b) McCool's alleged fraudulent transfers, and (c) McCool's failure to pay Beshears after repeated promises to do so.[81]  The First Amended § 523 Complaint did not contain a claim under § 523(a)(2)(A).

McCool again filed a motion to dismiss (the "***Second Motion to Dismiss***"),[82] arguing that Beshears failed to state a claim for relief under § 523(a)(6).  The Court denied the Second Motion

---

[76] *Plaintiff's First Amended Complaint Objecting to Dischargeability of Debt Under 11 U.S.C. § 523(a)(6)*, Adv. ECF No. 16.

[77] *Id.* ¶ 4.

[78] *Id.* ¶¶ 5-6.

[79] *Id.* ¶ 7.

[80] *Id.* ¶ 12.  In contrast to these allegations in the pleadings, Beshears testified at trial (as discussed below) that she made the loan in April 2008 based on McCool's promise to repay her first from either royalty payments or the Kansas land sale proceeds (not Fort Worth land sale proceeds).

[81] *Id.* ¶¶ 29-34.

[82] Adv. ECF No. 17.

to Dismiss,[83] concluding that Beshears's allegations about McCool's promise to repay the loan from the sale of specified real property, if proven, appears to fall within the ambit of *Texas v. Walker.*[84]

On May 18, 2018, Beshears filed a motion for leave to file a second amended complaint (the "***First Motion for Leave***"),[85] seeking leave to file an amended complaint (the "***Second Amended § 523 Complaint***") with additional allegations about McCool's promises made in April 2008. McCool objected, arguing in her papers and at the hearing that the new allegations would be time barred—and the proposed amendment would be futile—because the allegations allegedly pre-dated the conduct complained of in the First Amended Complaint.[86] At the hearing, the Court held that it would allow Beshears to file the amended complaint, reserving McCool's right to argue statute of limitations at trial. The Court then entered its order granting the First Motion for Leave.[87]

The Second Amended § 523 Complaint[88] again reiterated the following allegation that was in both the Original § 523 Complaint and First Amended § 523 Complaint: that in April 2008, "Ms. McCool manipulated Lynn [Ms. Beshears] into lending her money (as described more fully below)."[89] The Second Amended § 523 Complaint also alleges that in April 2008, McCool told Beshears that McCool had or would have royalty interests that would allow McCool to repay

---

[83] *Order Denying Motion to Dismiss with Prejudice*, Adv. ECF No. 25.

[84] 142 F.3d 813 (5th Cir. 1998) (fact question existed as to whether professor's debt to university was nondischargeable under § 523(a)(6) when professor breached written agreement to turn over to employer his outside earnings).

[85] *Plaintiff's Motion for Leave to File Second Amended Complaint*, Adv. ECF No. 54.

[86] *Defendant's Objection to Plaintiff's Motion for Leave to File Second Amended Complaint*, Adv. ECF No. 62.

[87] *Order Granting Motion for Leave to File Second Amended Complaint*, Adv. ECF No.73.

[88] *Plaintiff's Second Amended Complaint Objecting to Dischargeability of Debt Under 11 U.S.C. § 523(a)(6)*, Adv. ECF No. 68.

[89] *Id.* ¶ 4.

Beshears within 30 days from the date of the April loan.[90]  The Second Amended Complaint then alleges that when the thirty days came and went, McCool gave Beshears the Note (dated April 28, 2008 but not presented until the end of June 2008) and told Beshears (a) McCool owned property in both Fort Worth and Kansas, with the sale of either allowing for prompt repayment, (b) McCool would be able to sell one of these properties in 30-90 days, and (c) the new terms were necessary because McCool had not received—and would not be receiving—the royalty payments McCool had promised to use to pay Beshears.[91]

The Second Amended § 523 Complaint, however, does not allege that the April 2008 loan involved a promise by McCool to repay Beshears from the sale of the Kansas land.  Finally, the Second Amended § 523 Complaint asserted a cause of action under § 523(a)(6) based on (a) McCool's lies to a constable during Beshears's collection efforts, (b) McCool's alleged fraudulent transfers, and (c) McCool's failure to pay Beshears after repeated promises to do so and realizing that a failure to pay would injure Beshears's retirement efforts.[92]  The Second Amended § 523 Complaint did not contain a claim under § 523(a)(2)(A).

On September 17, 2018, Beshears filed a motion for leave to file a third amended complaint (the "***Second Motion for Leave***"),[93] requesting authority to file an amended complaint with a claim for relief under § 523(a)(2)(A) based on the allegation that McCool never intended to repay Beshears from the land sales or from the royalties.  McCool objected to that request,[94] arguing at

---

[90] *Id.* ¶¶ 5-6.

[91] These allegations—again—conflict with Beshears's testimony at trial that the initial April 2008 loan involved a promise to pay from either royalties or the Kansas land sale proceeds.

[92] *Id.* ¶¶ 18-36.

[93] *Plaintiff's Motion for Leave to File Third Amended Complaint*, Adv. ECF No. 77.

[94] *Defendant's Objection to Plaintiff's Motion for Leave to File Third Amended Complaint*, Adv. ECF No. 81.

the hearing that the additional claims in the proposed amended complaint would be barred by limitations, and thus the proposed amended complaint is futile. At the hearing, the Court granted the Second Motion for Leave, again leaving the limitations issue to be resolved at trial. The Court then entered its order granting the Second Motion for Leave.[95] Beshears then filed her third amended complaint (the "***Third Amended Complaint***").[96]

The Third Amended Complaint, when describing the April 24, 2008 loan, mentions only McCool's promise to repay the loan from royalty interests.[97] The Third Amended Complaint mentions McCool's statements about owning land in Fort Worth in Kansas, but only in connection with the June 2008 Note.[98] The Third Amended Complaint asserts claims under both § 523(a)(2)(A) and 523(a)(6).

McCool then filed her answer to the Third Amended Complaint (the "***Answer***"),[99] raising several affirmative defenses, which will be addressed, in turn, in section IV. C. below.

In the parties' Joint Pre-Trial Order,[100] in the section, "Summary of Plaintiff's Claims," Beshears alleges both (a) on April 24, 2008, McCool promised to repay Beshears from either royalty proceeds or from the "sale of certain land,"[101] and (b) in connection with the Note, McCool

---

[95] *Order Granting Motion for Leave to File Third Amended Complaint*, Adv. ECF No. 89. The Third Amended Complaint appears as a standalone docket entry found at Adv. ECF No. 92.

[96] *Third Amended Complaint Objecting to Dischargeability of Debt Under 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(6)*, Adv. ECF No. 92.

[97] *Id.* at ¶ 6.

[98] *Id.* ¶¶ 7-9. These allegations conflict with Beshears's testimony at trial that the initial April 2008 loan involved a promise to pay from either royalties or the Kansas land-sale proceeds. The Court has considered these conflicting allegations when analyzing and determining the ultimate credibility of Beshears's testimony.

[99] *Defendant's Answer to Third Amended Complaint*, Adv. ECF No. 90.

[100] *Joint Pre-Trial Order* [ECF No. 98].

[101] *Id.* § 1(A), at 2.

promised to repay the loan from the sale proceeds of either "one or two parcels of land."[102]  In the Contested Issues of Fact" section, the parties included "[w]hether Ms. McCool promised to repay the Loan from the proceeds from the sale of the 11.84 acre tract of land located in Ft. Worth, Texas or the sale of the 160 acre tract of land located in Kansas, whichever occurs first."[103]

As noted above, Beshears's allegations in her written papers regarding the underlying conduct, facts, and circumstances surrounding the April 2008 loan transaction have varied, and her fourth and final complaint—the Third Amended § 523 Complaint—mentions only a royalty promise in connection with the April 2008 loan transaction.  Although the parties' joint pre-trial order appears to allow Beshears to try the issue of whether a Kansas-land-sale promise was also part of the April 2008 loan,[104] the Court has fully considered Beshears's shifting positions in her various complaints when analyzing Beshears's credibility and as part of the Court's ultimate ruling.

The Court held a trial on the Third Amended Complaint on November 7, 2018 and March 18, 2019.

## III.    CREDIBILITY OF THE WITNESSES

Five witnesses testified during the trial:  (1) Beshears; (2) McCool; (3) Ms. Lisa Downs; (4) Ms. Jane Valdez; and (5) Mr. Josh Harvey.

---

[102] *Id.*

[103] *Id.* § 3.a, at 3.

[104] Although a party's pleadings generally identify the dispute between two parties, the pre-trial order supersedes the pleadings and becomes the governing pattern of the lawsuit.  *Pac. Indem. Co. v. Broward Cnty.*, 465 F.2d 99, 103 (5th Cir. 1972) (quotation marks omitted).

## A. Ms. Lynn Beshears

The Court finds that Beshears's testimony was persuasive and credible. In closing argument, McCool's counsel argued that "[Beshears] can't tell you when I took her deposition a year ago, but she sure remembers every single detail about what happened eleven years ago. And candidly, I think your Honor should find her – in fact, the entirety of her testimony not credible."[105] On its face, questioning a witness's recollection of specific conversations that took place eleven years ago is fair and prudent. And this Court carefully considered and weighed Beshears's testimony with this point front of mind.

In this case, however, even though the salient conversations took place eleven years ago, the Court finds that Beshears's testimony was persuasive and credible. And a noteworthy fact that supports how and why Beshears retained such a clear recollection of these specific conversations was the death of her son, as evidenced by Beshears's testimony in cross-examination by McCool's counsel:

$\longrightarrow$     Q. And your memory of these times is clearer than your memories of when I took your deposition?

       **A. It was a time that I remember clearly because of the death of my son and what I was going through.**[106]

Based on Beshears's demeanor and responses to questions on direct examination and throughout her cross-examination, the Court found her testimony to be genuine, persuasive, and credible. When one is confronted with a life-altering experience, such as the death of a child, it is

---

[105] Trial Tr. at 298.

[106] *Id.* at 8-9.

not unusual that everything that occurred during that time period is seared into one's memory.[107]

Likewise, even though the relevant conversations took place eleven years ago, those conversions

occurred within days of the one-year anniversary of Beshears's son's death, so it is believable that

at that time, when Beshears was emotionally coping with the one-year anniversary of her son's

death, her emotional conversations with McCool would also be seared into her memory.

In addition, the Court finds that McCool's subsequent emails with her attorney at Rattikin

& Rattikin, L.L.P. in late May, as well as the very terms McCool had inserted into the Note—

referencing the Kansas and Fort Worth properties and stating that the Note "shall be fully due and

payable upon the sale of" the Fort Worth and Kansas land "whichever occurs first"—lends

credibility to Beshears's recollection of the April 24, 2008 conversations with McCool.

## B.      Ms. Lisa Dawn McCool

The Court finds that McCool's testimony did not contradict or refute Beshears's testimony

concerning the salient facts in this case.  Rather, as evidenced throughout her testimony, although

McCool remembered having conversations with Beshears on or about April 24, 2008 requesting

the loan, she repeatedly testified that she either did not remember the specifics of the conversations

or that she had no reason to dispute Beshears's testimony.  The following are several representative

examples of McCool's testimony that she either did not remember the specifics of the April 24,

2008 conversations or that she had no reason to dispute Beshears's testimony:

> →     Q.  Did you tell Lynn [Beshears] how you were going to pay her back, this
> 420,000 dollars?
>
> **B.  I don't remember**.[108]

---

[107] For example, most Americans can tell you today where they were, who they were speaking with, and what they did all day long on Tuesday, September 11, 2001.  It is not inconceivable that the death of a child would have the same impact on one's memory.

[108] *Id.* at 8-9.

→    Q. . . . back in April of 2008, you may have promised Mrs. Beshears to pay her back using royalty payments you were receiving; correct?

**A. I -- I don't remember. I mean, I don't remember exactly, no, sir, I do not.**

Q. Okay, so you're not saying you didn't promise that; you're just saying you don't remember, one way or the other?

**A. Correct, I do not remember, one way or the other.**[109]

→    Q. You may have offered -- you may have told Lynn [Beshears] that you would pay her back using proceeds from the sale of the Fort Worth land, but you don't remember, one way or the other; correct?

**A. Correct.**[110]

→    Q. . . . when you were asking Lynn [Beshears] for this money, you may have also promised to pay her back using sale proceeds from the Kansas land; correct?

**A. We had a discussion over several stuff (sic), I'm sure. I mean --**

Q. You might have?

**A. Maybe, yes.**

Q. You just don't remember, one way or the other?

**A. Correct.**[111]

→    Q. Did you promise Lynn [Beshears] that you would pay her back within thirty to ninety days of the loan?

**A. I don't remember that, no.**

Q. Okay. Are you saying it didn't happen or you just don't remember?

**A. I don't remember.**[112]

---

[109] *Id.* at 9.

[110] *Id.* at 10.

[111] *Id.*

[112] *Id.*

⟶     Q. Okay. And again, if Ms. Beshears does remember, you wouldn't have any reason to doubt her memory; correct?

        **A. I -- I don't know. I mean, I -- I -- I guess not. I --yeah, I mean, I –**[113]

⟶     Q. Do you recall if Lynn, or Mrs. Beshears, asked you to promise her that she would be the first to get repaid from either royalty payments or proceeds from the sale of land?

        **A. I -- I don't remember.**[114]

⟶     Q. And -- I'm asking you if you have knowledge that you can share with the Court about whether you promised Ms. Beshears to pay her back within thirty to ninety days from the date she lent you the money in '08.

        **A. No, I don't remember that.**[115]

⟶     Q. Do you recall being very upset at the time you called Ms. Beshears?

        **A. I -- I mean, I don't recall that, but I'm not saying I wasn't.**[116]

⟶     Q. . . . Earlier today you told me you couldn't -- you weren't going to deny having promised Ms. Beshears to use proceeds from the sale of the Fort Worth land, to repay her. And so my question is, are you now changing that testimony?

        **A. No, I'm -- no, I apologize. I'm not changing that testimony, sorry.**

        Q. Okay. You might have promised her that; you just don't remember, correct?

        **A. Correct.**[117]

⟶     Q. Is it now your testimony you never -- that you never promised Lynn [Beshears] you would use royalty payments to pay her back?

---

[113] *Id.*

[114] *Id.* at 11.

[115] *Id.* at 12.

[116] *Id.* at 103.

[117] *Id.* at 253.

22

**A. I don't recall ever saying that I would use royalty payments. No, sir, I don't recall.**

Q. Okay, you don't know, one way or the other?

**A. I don't recall.**

Q. Does that mean you don't know, one way or the other, though?

**A. Yes, that means I don't know, one way or the other. Yes, sir.**

Q. Okay. Same question. For the sale of the – using proceeds from the sale of the Fort Worth land, you might have promised to use that or you might not have. You don't recall?

**A. Correct.**

Q. So -- and that same question for the Kansas land. You might have promised to use the proceeds from the sale of the Kansas land to pay her back, you just don't recall, one way or the other, correct?

**A. Well, I look at this email --**

Q. Is that correct?

**A. Yes.[118]**

→     Q. And you remember that she [Beshears] testified to the effect that you had promised her that you were going to use proceeds from the sale of the land to pay her back in full. Do you recall that testimony –

**A. Yes.**

Q. from her?

**A. Yes.**

Q. Okay. And as you sit here right now, you don't have any reason to disagree with that statement, true?

**A. True.**

Q. And for the Kansas land, you heard her [Beshears] testify -- do you recall her testifying you had promised to use proceeds from the sale of the Kansas land to pay her back in full?

**A. Yes.**

Q. You recall that testimony?

**A. Yes.**

---

[118] *Id.* at 257-58.

23

> Q. And as you sit here right now, you don't have any basis to say she's wrong about that, true?
>
> A. **True.**[119]

Overall, McCool's demeanor and evasiveness during her testimony call into question the credibility of her testimony. And McCool's credibility is further called into question by her past lack of candor with Beshears.[120] But because McCool's testimony does not contradict Beshears's clear and convincing testimony regarding McCool's statements and representations made during the April 24, 2008 telephone conversations, even if the Court were to conclude that McCool's testimony was credible, her testimony does not affect or weaken Beshears's credible testimony.

### C.   Ms. Lisa Downs

Ms. Downs testified about the financial status of the Diamond W during her employment as a data-entry employee. While Ms. Downs was a credible witness, her testimony provided little relevant evidence.

### D.   Ms. Jane Valdez

Ms. Valdez testified as to her understanding of McCool's 2008-11 tax returns. Ms. Valdez provided credible testimony that in 2008, McCool's business was hemorrhaging money.

### E.   Mr. Josh Harvey

Mr. Harvey testified about services he provided certain horses in his position as an equine veterinarian. Although Mr. Harvey was a credible witness, he provided little, if any, relevant evidence.

---

[119] *Id.* at 259-60.

[120] For example, but not by way of limitation, the Court believes that the March 4, 2010 sale of the Fort Worth property had, in fact, closed before her meeting at the hospital with Beshears and that McCool's statements about the sale not having closed were not true. *See* Trial Tr. at 138.

## IV.     ANALYSIS

In an adversary proceeding to determine the dischargeability of a debt under § 523(a), the plaintiff bears the burden of proving the elements by a preponderance of the evidence.[121]  In this case, Plaintiff has met her burden.

### A.     Beshears satisfied her burden to prove the § 523(a)(2)(A) claim by a preponderance of the evidence.

Section 523(a)(2)(A) of the Bankruptcy Code provides that a debt will not be discharged to the extent the debt was obtained by "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.[122]  The relevant time period for the § 523(a)(2)(A) inquiry is April 24–26, 2008, when McCool sought and obtained the loan from Beshears.[123]

### 1.     There is sufficient evidence that the debt was obtained under false pretenses and false representation.

False representation and false pretenses require the creditor to prove (i) the existence of a knowing and fraudulent falsehood, (ii) describing *past or current facts*, (iii) that was relied upon by the creditor.[124]  A debtor's promise related to a future action that does not purport to depict a current or past fact does not qualify as a false representation or a false pretense.[125]  In other words,

---

[121] *Grogan v. Garner*, 498 U.S. 279, 286 (1991).

[122] 11 U.S.C. § 523(a)(2)(A).

[123] Although the Note McCool gave Beshears in June 2008 changed the repayment terms of the loan, McCool had already obtained the money, so the June 2008 timeframe relative to the Note is not the relevant time period.

[124] *In re Allison*, 960 F.2d 481, 483 (5th Cir 1992).

[125] *In re Bercier*, 934 F.2d 689, 692 (5th Cir. 1991) (overruled on other grounds by *Husky Intern. Electronics, Inc. v. Ritz*, 136 S.Ct. 1581 (2016)).  *Husky* made clear that no misrepresentation is necessary to establish an "actual fraud" under § 523(a)(2)(A) of the Bankruptcy Code.  Courts in the Fifth Circuit continue to follow *Bercier*'s requirement that a "false representation" under § 523(a)(2)(A) must relate to past or current facts.  *See, e.g., In re Carter*, No. 17-35082, 2018 WL 6060391, at *23 (Bankr. S.D. Tex. Nov. 19, 2018); *In re Martin*, No. 15-41103, 2017 WL 1316928, at *10 (Bankr. E.D. Tex. Apr. 7, 2017).

a mere promise to be performed in the future is not sufficient to make a debt nondischargeable, even where there is no excuse for the subsequent breach.[126]

To satisfy the reliance element, the Supreme Court has held that the degree of reliance required under § 523(a)(2)(A) is justifiable reliance.[127]  Justifiable reliance does not require a plaintiff to demonstrate reasonableness nor does it impose a duty to investigate unless the falsity is readily apparent.[128]  "Whether a party justifiably relies on a misrepresentation is determined by looking at the circumstances of a particular case and the characteristics of a particular plaintiff, not by an objective standard."[129]

With these legal precepts in mind, the Court now turns to the alleged false representations and false pretenses that were made in connection with the April 24, 2008 loan.

> a)   *McCool's representations that "I own" land in Kansas that is "in the closing stage of a sale" and that McCool would repay Beshears in full from the sale proceeds within 30-90 days*

There are three related representations here.  McCool's first representation—that "I own" land in Kansas—was a false representation about a present fact.  McCool did not own the Kansas land on April 24, 2008.  According to Beshears's unrefuted testimony, McCool told her during the March 2010 meeting that McCool did not even have title to the land and that her stepfather would not sell it.[130]  Only later—the evidence is not clear how—did McCool and her brother become entitled to sell the Kansas land as its owners.  McCool's false representations was designed to induce Beshears to make the loan.

---

[126] *In re Allison*, 960 F.2d at 484 (citing 3 Collier on Bankruptcy 15th. Ed. § 523.08[4]).

[127] *Field v. Mans,* 516 U.S. 59, 70-71 (1995).

[128] *Id.* at 70-72.

[129] *In re Sims,* 479 B.R. 415, 425 (Bankr. S.D. Tex. 2012) (citing *Field,* 516 U.S. at 71).

[130] Trial Tr. at 139.

McCool's second representation—that the Kansas land was "in the closing stages of a sale"—also is a false representation about a present fact. There is no evidence in the record that the Kansas land was in the closing stages of a sale on April 24, 2008.  Rather, the evidence established that there was not a contract on the Kansas land until more than two years later—in November 2010—when the Kansas land was sold in December 2010.[131]  McCool's representation that "the Kansas property is in the closing process right now, I can have you paid within thirty days" was false at the time the representation was made.  McCool's false representations were designed to induce Beshears to make the loan.

McCool's third representation—that McCool would be able to repay Beshears, in full, from the sale proceeds within 30-90 days—is a closer call.  On the one hand, a mere representation that "I will pay you in 30-90 days" arguably is a promise about the future and not sufficient to support a § 523(a)(2)(A) false representation or false pretense claim.   In this case, however, McCool's representation went further when she represented that "Lynn, this Kansas property *is in the closing process right now*, I can have you paid within thirty days" which was a false representation of a present fact.  And this false representation was designed to induce Beshears to make the loan.

Did Beshears justifiably rely on any or all of the above misrepresentations of present facts?  The credible evidence demonstrated that Beshears did, in fact, justifiably rely on McCool's false representations and false pretenses.   Beshears does not have business or lending experience.  Rather, Beshears relied on McCool's representations and promises based on their friendship.  Further, Beshears was vulnerable given her emotional state due to the first anniversary of her son's death—a fact that was known to McCool.  Therefore, under the particular circumstances of this

---

[131] Pl.'s Exs. 21-23.

case and the characteristics of this particular plaintiff, the Court finds that Beshears's reliance was justifiable.

Therefore, based on the false representations just discussed, the Court finds and concludes that Beshears satisfied her burden under 11 U.S.C. § 523(a)(2)(A) to prove that the April 26, 2008 debt was obtained through false representations and false pretenses and Beshears's reliance on McCool's false representations and false pretenses was justified.

> b)      *McCool's representation that Beshears would be the "very first" person McCool pays back, whether it's from the Kansas land sale proceeds or from oil and gas royalties that McCool received.*

McCool represented and promised Beshears that she would be the "very first" person McCool would pay back "whether it's royalty or land you sell, will you give me your word that I will be the first one back – that you pay back?"  And McCool replied, "Lynn, I promise, I promise you'll be the very first."[132]  The promise to be the "very first" also constitutes a false representation that was designed to induce Beshears to make the loan.  The record is replete with direct and circumstantial evidence that McCool had received proceeds from the sale of the Kansas land, Fort Worth Land, and royalty proceeds, but she did not pay Beshears, and certainly did not pay Beshears "first" with such proceeds.  Based on McCool's actions, the Court finds and concludes that when McCool made her promises and representations to induce Beshears to make the loan, McCool did not intend at that time to, in fact, pay Beshears "first" with such proceeds.  Further, the credible evidence demonstrates that Beshears did, in fact, justifiably rely on McCool's false representations and false pretenses that she would be the "very first" person McCool would repay with such

---

[132] Trial Tr. at 121.

proceeds. Further, as noted above, under the particular circumstances of this case and the characteristics of this particular plaintiff, the Court finds that Beshears's reliance was justifiable.

Therefore, based on the false representations just discussed, the Court finds and concludes that Beshears satisfied her burden under 11 U.S.C. § 523(a)(2)(A) to prove that the April 26, 2008 debt was obtained through false representations and false pretenses and Beshears's reliance on McCool's false representations and false pretenses was justified.

### 2. *There is sufficient evidence of a debt obtained by fraud.*

The Fifth Circuit has explained the actual fraud component of § 523(a)(2) as follows:

> [A] cause of action for fraud will exist under 11 U.S.C. § 523(a)(2)(A) when a debtor makes promises of future action which, at the time they were made, he had no intention of fulfilling. In order to succeed on this legal theory, the objecting party must prove that: (1) the debtor made representations; (2) at the time they were made the debtor knew they were false; (3) the debtor made the representations with the intention and purpose to deceive the creditor; (4) that the creditor relied on such representations; and (5) that the creditor sustained losses as a proximate result of the representations.[133]

With this legal test in mind, the Court turns again to the false representations and false pretenses that were made in connection with the April 24, 2008 loan.

### a) *McCool's representations that "I own" land in Kansas that is in the closing stage of a sale and that McCool would be able to repay Beshears in full from the sale proceeds within 30-90 days*

The credible evidence establishes that (1) McCool made the representations that "I own" land in Kansas, and that "this Kansas property is in the closing process right now, I can have you paid within thirty days, I – I can't imagine it would take longer than that but, at the most, ninety days I'll have your money to you"[134]; (2) McCool knew at the time she made those representations

---

[133] *In re Bercier*, 934 F.2d 689, 692 (5th Cir. 1991) (following and quoting *In re Roeder*, 61 B.R. 179, 181 (Bankr. W.D. Ky. 1986)).

[134] Trial Tr. at. 120-21, 132.

that they were false; (3) McCool made the representations with the intention and purpose to deceive Beshears; (4) Beshears relied on such false representations; and (5) Beshears sustained losses (*i.e.*, the loss of the money lent and not repaid) as a proximate result of the false representations.

Therefore, based on the false representations just discussed, the Court finds and concludes that Beshears satisfied her burden under 11 U.S.C. § 523(a)(2)(A) to prove that the April 26, 2008 debt was obtained through fraud, Beshears's reliance on McCool's fraudulent statements was justified, and Beshears sustained losses as a proximate result of McCool's fraud.

    b) *McCool's representation that Beshears would be the "very first" person McCool pays back, whether it's from the Kansas land sale proceeds or from oil and gas royalties that McCool was expecting to receive.*

Likewise, the credible evidence establishes that (1) McCool made the representations that Beshears would be the "very first" person McCool would pay back from royalty or land sale proceeds; (2) McCool knew at the time she made those representations that they were false; (3) McCool made the representations with the intention and purpose to deceive Beshears; (4) Beshears relied on such false representations; and (5) Beshears sustained losses as a proximate result of the false representations.

Therefore, based on the false representations just discussed, the Court finds and concludes that Beshears satisfied her burden under 11 U.S.C. § 523(a)(2)(A) to prove that the April 26, 2008 debt was obtained through fraud, Beshears's reliance on McCool's fraudulent statements was justified, and Beshears sustained losses as a proximate result of McCool's fraud.

**B.** **Beshears failed to satisfy her burden to prove the § 523(a)(6) claim by a preponderance of the evidence.**

Section 523(a)(6) of the Bankruptcy Code excepts from a debtor's discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity."[135] The provision requires "a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury."[136] In the Fifth Circuit, "an injury is 'willful and malicious' where there is either (1) an objective substantial certainty of harm arising from a deliberate or intentional action or (2) a subjective motive to cause harm by a party taking a deliberate or intentional action."[137] Furthermore, "the debtor must have intended the actual injury that resulted."[138]

In this case, there little or no evidence in the record to support Beshears's malicious-injury allegations. Therefore, the Court finds and concludes that Beshears failed to satisfy her burden to establish a willful and malicious injury, and thus her § 523(a)(6) claim fails.

**C.** **McCool's affirmative defenses fail**

Even though McCool did not include her affirmative defenses in the parties' Joint Pre-Trial Order, the Court will address, in turn, each of alleged affirmative defenses pled in her Answer.[139]

### *1. Waiver*

Although McCool pled the affirmative defense of waiver, McCool did not (i) include "waiver" as an affirmative defense in the Joint Pre-Trial Order, (ii) offer any evidence of waiver during the trial, (iii) argue "waiver" in closing arguments, or (iv) raise the affirmative defense of

---

[135] 11 U.S.C. § 523(a)(6).

[136] *Kawaauhau v. Geiger,* 523 U.S. 57, 61 (1998).

[137] *In re Arnette,* 454 B.R. 663, 700 (Bankr. N.D. Tex. 2011) (citing *Matter of Miller,* 156 F.3d 598, 604-06 (5th Cir. 1998)).

[138] *Texas v. Walker,* 142 F.3d 813, 823 (5th Cir. 1998).

[139] ECF No. 90.

"waiver' in her post-trial briefing. Therefore, the Court finds and concludes that McCool failed to establish an affirmative defense of waiver.

### 2. Novation

Although McCool pled the affirmative defense of novation, McCool did not (i) include "novation" as an affirmative defense in the Joint Pre-Trial Order, (ii) argue "novation" in closing arguments, or (iii) raise the affirmative defense of "novation' in her post-trial briefing. Even if McCool were to have argued that the June 2008 Note was a novation of the April 2008 loan, that argument would not preclude Beshears from establishing that the April 2008 loan was obtained by false representations, false pretenses, or fraud.[140] Therefore, the Court finds and concludes that McCool failed to establish an affirmative defense of novation.

### 3. Each allegation of fraud or misrepresentation fails insofar as it relies on parole evidence not incorporated into the controlling agreement

McCool pled as an affirmative defense that "each allegation of fraud or misrepresentation fails insofar as it relies on parole evidence not incorporated into the controlling agreement." This alleged affirmation defense fails because the relevant allegations of fraud and misrepresentation were based on the oral telephone calls that took place between April 24-26, 2008 and did not involve a written "controlling agreement." Therefore, the Court finds and concludes that McCool failed to establish this asserted affirmative defense.

### 4. Each allegation of fraud or misrepresentation fails insofar as each allegation is based on statements relating to future contractual promises and not on statements relating to a past or existing fact

McCool pled as an affirmative defense that "each allegation of fraud or misrepresentation fails insofar as each allegation is based on statements relating to future contractual promises and

---

[140] See Archer v. Warner, 538 U.S. 314 (2003) (reducing an underlying fraud claim to settlement does not—through a "novation" theory—change the nature of the underlying debt for § 523(a)(2)(A) purposes).

not on statements relating to a past or existing fact." This alleged affirmation defense was not raised in the Joint Pre-Trial Order and, for all the reasons detailed in section IV. A. above, the fraudulent representations, false pretenses, and fraud were statements relating to past or existing facts. Therefore, the Court finds and concludes that McCool failed to establish this asserted affirmative defense.

### 5. Estoppel

Although McCool pled the affirmative defense of estoppel, McCool did not (i) include "estoppel" as an affirmative defense in the Joint Pre-Trial Order, (ii) offer any evidence to support estoppel during the trial, (iii) argue "estoppel" in closing arguments, or (iv) raise the affirmative defense of "estoppel' in her post-trial briefing. Therefore, the Court finds and concludes that McCool failed to establish an affirmative defense of estoppel.

### 6. Limitations

During the course of this adversary proceeding, McCool previously argued that the Court should deny Beshears's First Motion for Leave and her Second Motion for Leave because the proposed amendments (for the Second Amended § 523 Complaint and Third Amended § 523 Complaint) would be futile. According to McCool, the amendments would be futile because they add "new" and now time-barred claims that were not included in the timely filed complaint (the Original § 523 Complaint) filed by the December 19, 2016 deadline (established by Bankruptcy Rule 4004) to object to the dischargeability of debts. The Court rejects this argument.

Rule 15 of the Federal Rules of Civil Procedure, made applicable to this Adversary Proceeding by Bankruptcy Rule 7015, provides that an amendment to a pleading may relate back to the date of the original pleading "if the amendment asserts a claim or defense that arose out of

the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading."[141]

    While trial courts maintain discretion to deny a request to amend, Rule 15(a) carries "a bias in favor of granting leave to amend,"[142] unless the court can articulate a substantial reason to deny the motion.[143] Once amended, Rule 15(c) allows such amendments to be controlled by, or "relate back" to, the date of the filing of the original complaint.[144] Without this treatment, amendments filed beyond Rule 4004(a)'s 60-day deadline would be considered untimely.[145]

    To qualify under Rule 15(c)'s grant, the amendment must assert a claim "that arose out of the conduct, transaction, or occurrence set out–or attempted to be set out–in the original pleading[]"[146] to ensure "fair notice that the litigation is arising out of a specific factual situation."[147] Case law instructs this Court not to consider the legal theory or "caption given a particular cause of action."[148] Instead, the underlying facts presented carry the day: Relation back will be permitted where the conduct alleged in the amended complaint refers to substantially the same conduct addressed in the original complaint.[149] Stated simply, parties may amend and

---

[141] FED. R. CIV. P. 15(c)(1)(B).

[142] *Dussuoy v. Gulf Coast Inc. Corp.* 660 F.2d 594, 598 (5th Cir. 1981).

[143] *Lyn-Lea Travel Corp. v. American Airlines*, 283 F.3d. 282 (5th Cir. 2002).

[144] *See* FED. R. CIV. P. 15(C).

[145] BANKR. R. 4004(A) (allows a party "60 days after" the meeting of creditors to file complaints objecting to discharge).

[146] FED. R. CIV. P. 15(C).

[147] *Johnson v. Crown Enters.*, 398 F.3d 339, 343 (5th Cir. 2005).

[148] *Baker v. Carter*, No. 4:12–CV–478, 2013 WL 1196106 (Mar. 22, 2013 E.D. Tex.); *Johnson,* 398 F.3d 339.

[149] *See Johnson,* 398 F.3d 339; *see also Cardiovascular Surgery of Alexandria, LLC v. Kerry*, No. 10–1003, 2011 WL 672244, *3 (W.D.La. Feb. 17, 2011).

elaborate on original facts and grounds for relief, but may not go beyond what is alleged in the original complaint.

In *In re Riggert*, our sister Court concluded that a proposed amendment could not relate back to the original complaint because it asserted new conduct and alleged new transactions not asserted in the original complaint.[150]   There, a complaint was filed that asserted the non-dischargeability of a debt stemming from a 2007 home refinancing.[151]   In its amendment, the movants added allegations wholly separate from the 2007 refinancing to support non-dischargeability, including a 2004 refinancing and other conduct from 2004, 2005, and 2008.[152] That court found that these new allegations went beyond merely presenting new facts to "amplif[y] or clarif[y]" the original complaint, and instead presented wholly new grounds to deny the debtor's discharge that would not relate back to the original complaint.[153]

In this case, considering the facts alleged in all the complaints without regard to the caption or legal theory presented therein, this Court finds that each of the amended complaints is merely an amplification of the grounds presented in the original complaint, namely that in April 2008 "Ms. McCool manipulated Ms. Beshears into lending her money."[154]   Despite the anamorphous nature of the complaint, the grounds presented for non-dischargeability remained constant— "Ms. McCool manipulated Ms. Beshears into lending her money."[155]   Beshears's amended

---

[150] *The Cadle Co. v. Riggert (In re Riggert)*, 399 B.R. 453 (N.D. Tex. 2009).

[151] *Id*. at 459.

[152] *Id*. at 459–60.

[153] *Id*. at 460; *see also Regal Fin. Bank v. Heaton (In re Heaton),* 2010 WL 4864811 (Bankr. N.D. Cal. Nov. 28, 2010) (first complaint asserted non-dischargeability stemming from misrepresentations in 2008 financial statements, but amended complaint asserted misrepresentations in 2006 financial statement and could not relate back).

[154] Adv. ECF No. 1, ¶ 4.

[155] ECF Nos. 1, 16, 68, 92.

complaints did not purport to assert new, independent grounds for dischargeability. Throughout the complaints' many forms, all of the newly alleged facts stemmed from the same alleged conduct or transaction (the underlying manipulation of Beshears into lending money to McCool in April 2008) that Beshears alleges should render her claim nondischargeable. The original complaint ensured proper notice of this "specific factual situation" in dispute, and subsequent amendments merely elaborated, amplified, or clarified these factual grounds.

Beshears's complaints all relate back to the date of the first complaint under Federal Civil Rule 15. Therefore, Beshears's claims are not barred by limitations, and McCool's affirmative defense of limitations fails.

## V. CONCLUSION

Beshears has established a nondischargeable claim in the amount of $421,030.97, along with 9% per-annum post judgment interest from April 3, 2013 until paid and attorney's fees of $42,103.10, along with 5% per-annum post judgment interest from April 3, 2013 until paid.[156] All other causes of action and relief are denied.

The Court will enter a separate Judgment consistent with these Findings of Fact and Conclusions of Law.

### ### END OF FINDINGS OF FACT AND CONCLUSIONS OF LAW ###

---

[156] These amounts were awarded in the Underlying Judgment. *Cf. In re Gober,* 100 F.3d 1195, 1208 (5th Cir. 1996) ("[T]he status of ancillary obligations such as attorney's fees and interest depends on that of the primary debt. When the primary debt is nondischargeable due to willful and malicious conduct, the attorney's fees and interest accompanying compensatory damages, including post-judgment interest, are likewise nondischargeable.").